**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TODD A. CORNELL, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. 4:11-CV-843 |
| | : | |
| vs. | : | (Complaint Filed 5/3/11) |
| | : | |
| MICHAEL ASTRUE, | : | |
| COMMISSIONER OF SOCIAL | : | (Judge Caputo) |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM**

**BACKGROUND**

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Todd A. Cornell's claim for social security disability insurance benefits and supplemental security income benefits. For the reasons set forth below we will affirm the decision of the Commissioner.

On August 14, 2007, Cornell filed protectively[1] an application for disability insurance benefits and an application for supplemental security income benefits. Tr. 9, 93-94, 125 and 150.[2]  The applications were initially denied by the Bureau of Disability Determination[3] on January 8, 2008. Tr. 9 and 93-102. On March 6, 2008, Cornell requested

---

[1]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[2]References to "Tr._" are to pages of the administrative record filed by the Defendant as part of his Answer on July 11, 2011.

[3]The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 95 and 99.

a hearing before an administrative law judge. Tr. 9 and 103.  After about 15 months had passed, a hearing was held on May 29, 2009. Tr. 19-75.  On August 7, 2009,  the administrative law judge issued a decision denying Cornell's applications. Tr. 9-18.  On August 18, 2009, Cornell filed a request for review with the Appeals Council and on September 24, 2009, the Appeals Council concluded that there was no basis upon which to grant Cornell's request. Tr. 1-5 and 110-111.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Cornell than filed a civil complaint in this court and on March 16, 2010, the case was remanded to the Commissioner based on a motion filed by the Commissioner to remand the case for further proceedings.  Tr. 409.   A second hearing before the same administrative law judge was held on October 6, 2010. Tr. 328-362.   On November 17, 2010, the administrative law judge issued a decision denying Cornell's applications. Tr. 282-296 and 309-323.   On December 27, 2010, Cornell filed a request for review with the Appeals Council and on April 15, 2011, the Appeals Council deemed Cornell's appeal untimely and advised him that the administrative law judge's decision stood as the final decision of the Commissioner. Tr. 274-276.   Cornell was further advised of his right to file an action in federal court.  Id.

Cornell then filed a complaint in this court on May 3, 2011.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on October 11, 2011,  when Cornell elected not to file a reply brief.

---

[4]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Cornell met the insured status requirements of the Social Security Act through December 31, 2011. Tr. 9, 11, 151, 282 and 284.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.

Cornell, who was born in the United States on May 13, 1969,[5] graduated from high school in 1988 and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 93, 113, 154, 159, 181 and 233.  During his elementary and secondary schooling, Cornell attended regular education classes. Tr. 159.  After high school Cornell attended Bloomsburg University for "half a semester" and then completed training to become a truck driver and obtained a commercial driver's license in 1998. Tr. 159 and 230-231.

Cornell has past relevant work experience[6] as a truck driver, cashier and

---

[5]At the time of the second administrative hearing and the administrative law judge's decision, Cornell was 41 years of age and considered a "younger individual" whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c).  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

[6]Past relevant employment in the present case means work performed by Cornell during the 15 years prior to the date his claim for disability was adjudicated by the

(continued...)

maintenance worker. Tr.  156 and 353.   These positions were described by a vocational

expert as semi-skilled, light to medium work.[7]  Tr. 64 and 353.

---

[6](...continued)
Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

[7]The terms sedentary, light, medium and heavy work are defined in the regulations
of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting
> no more than 10 pounds at a time and occasionally
> lifting or carrying articles like docket files, ledgers, and
> small tools. Although a sedentary job is defined as one
> which involves sitting, a certain amount of walking and
> standing is often necessary in carrying out job duties.
> Jobs are sedentary if walking and standing are required
> occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more
> than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even
> though the weight lifted may be very little, a job is
> in this category when it requires a good deal of
> walking or standing, or when it involves sitting most
> of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a
> full or wide range of light work, you must have the
> ability to do substantially all of these activities.
> If someone can do light work, we determine that
> he or she can also do sedentary work, unless there
> are additional limiting factors such as  loss of fine
> dexterity or inability to sit for long periods of time.

> (c) *Medium work*.  Medium work involves lifting no
> more than 50 pounds at a time with frequent lifting or
> carrying of objects weighing up to 25 pounds.  If
> someone can do medium work, we determine that
> he or she can do sedentary and light work.

> (d) *Heavy work*.  Heavy work involves lifting no more
> than 100 pounds at a time with frequent lifting or
> carrying of objects weighing up to 50 pounds. If

(continued...)

Records of the Social Security Administration reveal that Cornell had reported earnings in 1987 through 2007. Tr. 133-134. Cornell's total earnings during those years were $409,387.57. Id. Cornell's last work which amounted to substantial gainful activity was as a truck driver. Tr. 156. He terminated that employment on March 31, 2007. Tr. 155. The record reveals that Cornell did work for five days as a laborer in June, 2007, and at a farmer's market in Bloomsburg sometime during the second half of 2007. Tr. 141 and 231. Cornell has not worked since the second half of 2007. Tr. 231.

Cornell alleges that he became disabled on March 31, 2007, because of depression, obesity and sleep apnea.[8] Tr. 22-23, 95, 99 and 155. In documents filed with the Social Security Administration Cornell claimed that he does "not have the drive to work anymore" and that he stopped working in March, 2007, because "he couldn't handle it anymore." Tr. 155. He also claimed that he "feel[s] like [he has] no energy to do anything." Tr. 198.

For the reasons set forth below we will affirm the decision of the Commissioner denying Cornell disability insurance and supplemental security income benefits.

---

[7](...continued)
     someone can do heavy work, we determine that he
     or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

[8]Counsel for Cornell admitted at the administrative hearing held on May 29, 2009, that there was no "clear diagnosis" of sleep apnea. TR. 23.

5

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately

developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064.   The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.   Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,

7

> engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment that is severe or a combination of impairments that is severe,[10] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[11] (4) has the residual functional capacity to return to his or her past work and

---

[9] If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

[10] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

[11] If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the

(continued...)

(5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS AND OTHER EVIDENCE**

We will now review some of the pertinent medical and other evidence of Cornell's functional abilities.

There is very limited objective medical evidence from Cornell's treating medical providers during  the relevant time period ( i.e., March 31, 2007, the alleged disability onset

---

[11](...continued)
sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

[12]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

date, through November 17, 2010, the date of the administrative law judge's second decision).  Cornell's primary care physician was Leon Francis, M.D.

In October, 2007, Cornell had an appointment with Dr. Francis for a physical examination required in order for Cornell to maintain his commercial driver's license. Tr. 224-228.  On the  portion of the certification form completed by Cornell , he indicated that he had no illness or injury in the last 8 years; he had no head/brain injuries, disorders or illnesses; he did not have seizures or epilepsy; he had no eye disorders or impaired vision and no ear disorders, loss of hearing or balance; he had no  heart disease or cardiovascular conditions; he did not have high blood pressure or shortness of breath; he did not have muscular, lung, kidney or liver disease; he did not have digestive problems or diabetes; he did not have fainting, dizziness, sleep disorders, stroke or paralysis, a missing or impaired hand, arm, foot, leg, finger or toe, spinal injury or disease or chronic low back pain; he did not have loss of or altered consciousness. Tr. 224.  Cornell also indicated he did not use alcohol or narcotics.  Id.  Cornell only indicated that he was on Wellbutrin for depression. Id.

On the certification form Dr. Francis indicated that Cornell's depression was well-controlled with Wellbutrin. Id.  The form further reveals that Dr. Francis found that Cornell had no physical impairments or medical conditions that would prevent him from maintaining a commercial driver's license.  Tr. 226 and 228.  Dr. Francis noted that Cornell was 391 pounds but that he was not markedly overweight and Cornell met the standards

of 49 C.F.R. § 391.41 and qualified for a 2 year certificate.[13] <u>Id.</u>

---

[13]49 C.F.R. § 391.41(b) provides in pertinent part as follows:

(b) A person is physically qualified to drive a commercial motor vehicle if that person –

(1) Has no loss of a foot, a leg, a hand, or an arm, or has been granted a skill performance evaluation certificate . . . .

(2) Has no impairment of:

(I) A hand or finger which interferes with prehension or power grasping; or

(ii) An arm, foot or leg which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or any other significant limb defect or limitation which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle . . . .

(3) Has no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin to control;

(4) Has no current clinical diagnosis of myocardial infarction, agina . . . or any other cardiovascular disease . . .

(5) Has no established medical history of clinical diagnosis of a respiratory dysfunction likely to interfere with his/her ability to control and drive a commercial motor vehicle safely;

(6) Has no current clinical diagnosis of high blood pressure likely to Interfere with his/her ability to operate a commercial motor vehicle safely;

(7) Has no established medical history or clinical diagnosis of rheumatic, arthritic, orthopedic, muscular, neuromuscular, or vascular disease which interferes with his/her ability to control and operate a commercial motor vehicle safely;

(8) Has no established medical history or clinical diagnosis of epilepsy or any other condition which is likely to cause loss of consciousness or any loss of ability to control a commercial

(continued...)

The record also reveals that the Wellbutrin was prescribed by Dr. Francis at an appointment with Cornell on September 4, 2007, until Cornell could be seen by a psychiatrist. Tr. 217-218.   The treatment notes of this appointment are totally lacking in any objective mental status findings indicative of Cornell suffering from severe or even moderate depression. Id.   In fact at an appointment in January, 2007, Dr. Francis had refused to prescribe any medications for Cornell's alleged bipolar disorder. Tr. 219.   In the notes of that January appointment Dr. Francis stated as follows: "He is asking if I could give him something for bipolar. I told him I really should not.  I gave him the name of Dr. Rashad on Old Berwick Road to just get plugged into mental health as bipolar can be a little tricky." Id.

On December 25, 2007, Cornell was examined by Sue Labar Yohey, M.Ed., a psychologist, on behalf of the Bureau of Disability Determination. Tr. 229-238.  Cornell came to the evaluation by himself. Tr. 229.  Cornell told Ms. Yohey that his parents lived together, his father has a reading problem and his mother has bipolar disorder and multiple personalities. Id.  Cornell told Ms. Yohey that he was not presently in any type of counseling. Tr. 229 and 231.   Ms. Yohey observed that Cornell was sad, but his motor behavior was

---

[13](...continued)
> motor vehicle;
>
> (9) Has no mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his/her ability to drive a commercial motor vehicle safely;
>
> *       *       *       *       *       *       *       *       *       *

49 C.F.R. § 391.41(b).

appropriate and he had relevant speech. Tr. 232.  Cornell stated that he was able to engage in several daily activities including writing a grocery list, shopping, lifting 40 pounds, counting money, writing checks, using simple hand tools, running errands, and performing his own grooming and personal care. Tr. 233.  Cornell told Ms. Yohey that he belonged to a four wheeler group, that he went to one car show in the last year and that he was able to carry out instructions. Tr. 234.  He further stated that if he "had a job appointment to go to daily he would maintain regular attendance if that were something he liked." Tr. 235.  Ms. Yohey's assessment was that Cornell suffered from major depressive disorder but was only slightly restricted in his ability to understand, remember and carry out simple instructions. Tr. 235 and 237.  He was slightly to moderately limited in his ability to understand, remember and carry out detailed instructions, make judgments on simple work-related decisions, and interact appropriately with the public, supervisors and co-workers; and he was moderately limited in his ability to respond appropriately to work pressures and changes in a work setting. Tr. 237.

On January 8, 2008, John N. Grutkowski, Ph.D., reviewed Cornell's medical records on behalf of the Bureau of Disability Determination and concluded that Cornell suffered from major depressive disorder but that it was not a severe mental impairment. Tr. 247-259.  Dr. Grutkowski found that Cornell had mild limitations with respect to activities of daily living, maintaining social functioning and concentration, persistence or pace. Tr. 257. He further found that Cornell had no repeated episodes of decompensation of an extended duration. Id.

On February 21, 2008, Cornell had a one-time consultation with Louisa Lance, M.D., a psychiatrist. Tr. 260-261. Dr. Lance determined that Cornell's mental status was

within normal limits, and found no signs of bipolar disorder, but found that Cornell had symptoms of major depressive disorder. Id.  Dr. Lance gave Cornell a Global Assessment of Functioning (GAF) score of 40-45.[14] Id.  In rendering a diagnosis, Dr. Lance relied on statements from Cornell's parents.

On December 16, 2008, Dr. Francis filled out a "Physician's Information Request" for the domestic relations section of the Court of Common Pleas of Columbia Count, Pennsylvania. Tr. 271.  In contrast to his statements in October, 2007, on the commercial driver's license certification form, Dr. Francis stated in a conclusory fashion that Cornell had been continuously disabled because of bipolar disorder from 2007 through "ongoing" but was "unable to determine" when Cornell could return to work.  Id.  Dr. Francis did not indicate that Cornell was disabled from a physical standpoint. Id.

In April 2009, Cornell was evaluated by Robert Gerstman, D.O., a psychiatrist.

---

[14]The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id.  The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination.  The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning.  The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.  Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas,  such as work or school, family relations, judgment, thinking or mood. Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id.

Tr. 272-273.  At that evaluation, Cornell complained of depression, poor concentration, feeling tired with irregular sleep, a sad mood, poor self-esteem and being "a little frustrated that he hasn't worked in two years." Id.  Cornell told Dr. Gerstman that he was "now going to take classes at McCann School of Business to try to get an accounting degree" and that he was "currently off of medications[.]" Id.   Dr. Gerstman noted that Cornell had "partial custody of his 15 year old son who he gets to see on some weekends." Id.  A mental status examination was essentially normal other than Cornell's mood was "eh" and his affect restricted. Id.  It was noted that Cornell did not have any "thoughts of self-harm or harm to others" and he did not have any hallucinations or delusions; his cognition was intact and his insight and judgment were appropriate. Id.  Dr. Gerstman concluded that Cornell suffered from recurrent major depressive disorder and gave him a GAS score of 55, representing moderate symptoms. Id.

On May 3, 2010,  Cornell was examined by Karl A. Hoffman, Ph.D., a psychologist, on behalf of the Bureau of Disability Determination. Tr. 492-498.  Cornell told Dr. Hoffman that he last worked in March of 2007 as a tractor-trailer driver, a position which he held for nine years. Tr. 495.  With respect to the circumstances surrounding his termination of work, Cornell told Dr. Hoffman that "he left this employment due to problems he was experiencing at that time concerning child visitation rights, and his availability as a long distance truck driver to actually exercise his visitation rights." Id.  Cornell further explained that "he eventually quit his job as a tractor-trailer driver because the 'dispatcher' did not or would not accommodate his scheduled weekend visitations with his children." Id. Under the section of Dr. Hoffman's report entitled "Mental Status Examination," Dr. Hoffman stated that Cornell was "basically hygienic and appropriate" but "demonstrate[d] very slow

15

and labored ambulation that was consistent with his level of obesity." Tr. 496. Dr. Hoffman noted that Cornell was "alert and oriented, and was cooperative and relevant as the interviewee." Id. Cornell's language functioning was normal. Id. Cornell described his mood as "Okay, it's not great." Id. Cornell's affect was "somewhat constricted, but otherwise . . .stable[.]" Id. Cornell did not demonstrate agitation, irritability, tearfulness or any aspects of dysphoria.[15] Id. Recent and remote memory were intact. Id. Cornell denied suicidal and homicidal ideations, delusions, and hallucinations. Tr. 497. Cornell's insight was "basically superficial" but his judgment was "basically intact." Id. Dr. Hoffman stated that Cornell was "somewhat vague" with respect to his employment history. Tr. 496-497. As for the vagueness Cornell initially stated that he last worked in March, 2007, but then indicated he attempted to work in a factory and then later disclosed there may have "been a total of 'three or four' jobs that he tried briefly." Id.

Dr. Hoffman concluded that Cornell suffered from major depressive disorder, recurrent, but that his primary difficulty was his physical status. Tr. 497-498. With respect to Cornell's mental impairment, Dr. Hoffman stated that Cornell did not present with a case of bipolar disorder. Tr. 498. Also, Cornell's depression was mild to moderate and would not prevent Cornell from performing work-related activities. Id. Cornell told Dr. Hoffman that the primary reason he could not work was because of obesity and that mood swings were a secondary issue. Id.

Dr. Hoffman found that Cornell had no impairment with respect to understanding, remembering and carrying out short simple instructions and making judgment

---

[15]Dysphoria is defined as "disquiet; restlessness; malaise." Dorland's Illustrated Medical Dictionary, 579 (32nd Ed. 2012).

on simple work related decisions; a slight impairment with respect to understanding, remembering and carrying out detailed instructions and responding appropriately to changes in a routine work setting; slight to moderate impairment with respect to interacting appropriately with co-workers; and a moderate impairment with respect to interacting appropriately with the public and supervisors, and responding appropriately to work pressures in a usual work setting. Tr. 492.

On September 13, 2007, Cornell was interviewed face-to-face by C. Kondrchek, an employee of the Social Security Administration. Tr. 152.  Kondrchek reported that Cornell did not have any problem hearing, reading, breathing, understanding, coherency, concentrating, talking, answering questions, sitting, standing, walking, seeing, using his hand and writing. Id.   Kondrchek noted that Cornell "seemed morose." Id.

During the initial claim process, Cornell was requested to provide information regarding his functional limitations.  On November 8, 2007, Cornell indicated in a document entitled "Function Report - Adult" that he "go[es] to appointments, shop[s], lay[s] on couch [and] watch[es] TV." Tr. 178.  Cornell claimed that he does not care about personal hygiene and grooming and that he needs special reminders regarding grooming. Tr. 179-180. Cornell is able to prepare his own meals. Tr. 180.   Cornell stated that he can do house and yard work but that "I just don[']t have the urge to do it." Id.   Cornell goes outside 1 to 3 times per day and is able to walk and drive a car. Tr. 181.   Cornell is able to go out alone and he shops in stores and by computer and he is able to pay bills, count change, handle a savings account and use a checkbook and money orders. Id.   Cornell indicated that he enjoys watching TV and collecting die cast cars.  Tr. 182.   Cornell when given an opportunity to do so noted no problems with lifting, squatting, bending, standing, reaching, walking, sitting,

kneeling, talking, hearing, stair climbing, seeing and using his hands. Tr. 183.

At the administrative hearing held on May 29, 2009, Cornell's mother testified that Cornell was able to walk from his residence 2.5 miles to the grocery store in Danville, Pennsylvania, a round trip of 5 miles. Tr. 61.  She further testified that Cornell goes to movies and fishing with his teenage son. Tr. 58-59.

On October 6, 2010, Cornell drove himself 56 miles to the second administrative hearing. Tr. 347.  At the hearing on October 6, 2010, Cornell testified that he has visitation with his 16 year old son every other weekend; he walk 2-3 miles to attend his son's football games once a month; and when he starts something he finished it. Tr. 339-340 and 348.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Cornell had not engaged in substantial gainful work activity since March 31, 2007, the alleged disability onset date.  Tr. 284.

At step two of the sequential evaluation process, the administrative law judge found that Cornell had the following severe impairments: "major depressive disorder [and] obesity." Id.  The administrative law judge stated as follows: "The consultative examination performed on May 23, 2010 by Karl A. Hoffman, Ph.D., cast some doubt on the sustainability of a true-bipolar disorder diagnosis, especially in the aspect of repeated manic phases being identified in the medical records, or for that matter an (sic) recurrent major depressive disorder diagnosis of an ongoing nature. Still based on the record, the undersigned opines that a major depressive disorder is appropriate here." Tr. 285.

At step three of the sequential evaluation process the administrative law judge

found that Cornell's impairments did not individually or in combination meet or equal a listed impairment. Tr. 285-287.

At step four of the sequential evaluation process the administrative law judge found that Cornell could not perform his prior relevant semi-skilled, light to medium work but that he had the residual functional capacity to perform a limited range of unskilled, sedentary to medium work.  Tr. 287-294.  The administrative law judge specifically mentioned Cornell's obesity and then stated that Cornell

> would have some difficulty in engaging in activities such as climbing ladders, scaffolds, ropes, stairs and ramps on any more than an occasional basis. However, there is no diminution in the use of the body for handling, fingering, feeling, or grasping on a gross or fine motor level.  There is no diminution in terms of the functional activity of bending, stooping or the other postural activities.  Given the psycho-social/psychological evidence of record, the individual should be performing work that is not set forth in a customer service or direct-sales context, meaning involving task-required interactions with members of the public on a persistent basis.  He can tolerate the presence of co-workers and members of the public and can actually engage in moderate dialogue with members of the public from a simple inquiry basis and informational relation basis. He can tolerate the presence of public and can relate information of a brief nature to members of the public, but is excluded from direct sales or a customer-service representative type activity of a direct in-person nature.  He would be able to tolerate a predictable, stable work setting, not subject to frequent changes in the work setting. The work itself should not involve independent judgment or decisionmaking from a supervisory-type mode.

Tr. 287.  In concluding that Cornell had the residual functional capacity to engage in this limited range of unskilled work, the administrative law judge relied on the opinions of Dr. Hoffman, Dr. Gerstman, Dr. Grutkowski and Ms. Yohey.  The administrative law judge found that Cornell's statements concerning his limitations were not credible to the extent that they were inconsistent with the ability to perform this limited range of unskilled work. Tr. 288. The administrative law judge further rejected the conclusory opinion of Dr. Francis and the

suggestion of disability (i.e., the GAS score of 40 to 45) set forth in the report of the  one-time evaluation of Dr. Lance.  The administrative law judge explained his rejection of the opinions of Dr. Francis and Dr. Lance as follows:

> [T]he undersigned disagrees with the opinion of Dr. Francis that the claimant is disabled.  There is no explanation whatsoever in the form he completed explaining why he believes that the claimant is disabled.   The Social Security Administration accords controlling weight to the opinion of a treating physician where it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence[.] However, this rule does not apply to statements of opinion upon the ultimate issue of disability, which is reserved to the Commissioner[.] Moreover, the opinion upon the issue of disability expressed by Dr. Francis is purely conclusory, without any supporting explanation or rationale.  Such conclusions are weak evidence at best. . . . In addition, the undersigned again gave little weight to the findings of Louisa Lance, M.D., as they contradict the conclusions and the opinions expressed by Dr. Gerstman and the more recent findings of Dr. Hoffman[.]

Tr. 291-292.

At step five, the administrative law judge based on a residual functional capacity of a limited range of unskilled work as described above and the testimony of a vocational expert found that Cornell had the ability to perform unskilled, medium work as a floor cleaner/waxer, a busperson, and a hand packager, and unskilled, sedentary work as an assembler of small products, inspector, and a document preparer,  and that there were a significant number of such jobs in Northeastern Pennsylvania. Tr.  295 and 356-360.

The administrative record in this case is 498 pages in length and we have thoroughly reviewed that record.  The administrative law judge did an excellent job of reviewing Cornell's vocational history and medical records in his decision. Tr. 282-296. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 14, Brief of Defendant.

Cornell argues that the administrative law judge erred by failing to (1) appropriately evaluate and consider his credibility, the opinion of Dr. Francis, and the consultative examination of Dr. Lance; (2) consider the impact of his obesity; and (3) include in the  hypothetical question posed to the vocational expert all of Cornell's impairments.  We find no merit in Cornell's arguments.

The administrative law judge gave an adequate explanation for discounting the conclusory opinion of Dr. Francis.  Dr. Francis's disability opinion set forth on the one-page form of the domestic relations section of the Columbia County Court of Common Pleas is contrary to his prior commercial driver's license certification and Dr. Francis was not a specialist in the area of psychology or psychiatry.  In fact, the administrative law judge pointed out that Dr. Francis initially refused to treat Cornell for his mental impairment and referred him instead to a mental health professional. Tr. 210 and 318.   Moreover, the administrative law judge was not obligated to accept the one-time consultative examination performed by Dr. Lance.

Dr. Francis's opinion and the report of Dr. Lance  were also inconsistent with the other evidence of record, including the psychological evaluation of Dr. Gerstman. Although Dr. Lance gave Cornell a GAS score of 40 to 45,  Dr. Gerstman gave Cornell a GAS score of 55. Tr. 273 and 317.

The record contains several functional assessments (Dr. Hoffman, Dr. Gerstman, Dr. Grutkowski, and Ms. Yohey)  which fully support the administrative law judge's residual functional capacity determination.  The administrative law judge's reliance on those functional assessments was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011) ("Having found that the [state agency physician's]

21

report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]"). The administrative law judge appropriately took into account Cornell's functional limitations in the residual functional capacity assessment. Furthermore, the commercial driver's license certification of Dr. Francis and Cornell's statements on the certification form support the administrative law judge's decision.

The administrative law judge stated that Cornell's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled, sedentary to medium work. Tr. 288.  The administrative law judge was not required to accept Cornell's subjective claims regarding his physical and mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").  Because the administrative law judge observed Cornell when he testified at the hearings on May 29, 2009, and October 6, 2010, the administrative law judge is the one best suited to assess the credibility of Cornell.

The issue of Cornell's obesity was adequately addressed by the administrative law judge in his decision.  Tr. 311, 314 and 320.  The ALJ concluded that Cornell's obesity

was a severe impairment and appropriately considered it when setting Cornell's residual functional capacity.  Counsel for Cornell at the hearing admitted that there was no physical diagnosis to which the obesity could be attached. Tr. 24.  Cornell further reported that  his impairments did not affect his ability to lift, squat, bend, stand, reach, walk, sit or kneel. Tr. 183.  Cornell admitted that he did not need any devices to assist with breathing; he could lift 40 pounds, he could carry groceries into the house; he could go fishing; he belonged to a four wheeler group; and he could walk up to 3 miles. Tr. 58, 61, 233-234, 339, 346 and 348. There is no objective medical evidence that Cornell's obesity imposed functional limitations greater than those set by the administrative law judge in the RFC assessment. Moreover, Dr. Francis when he completed the commercial driver's license certification noted Cornell's weight and that it would not limit him from engaging in semi-skilled, medium work as a truck driver.

Finally, with respect to Cornell's claim that the ALJ's hypothetical question did not reflect all of Cornell's impairments, an ALJ need only include those limitations that are supported by the record.  See Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004).  We are satisfied that the ALJ included in the hypothetical question all of the impairments which were supported by the record.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

s/A. Richard Caputo
A. RICHARD CAPUTO
United States District Judge

Dated: July 12, 2012